FOX ROTHSCHILD LLP
Kathleen M. Aiello
101 Park Avenue, 17th Floor
New York, New York 10178
(212) 878-7900

*Attorneys for Goddard Systems, Inc., Creditor and
Party-in-Interest*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re                                                :
                                                     :  Chapter 11
CREATIVE LEARNING SYSTEMS, LLC,                      :
                                                     :  Case No. 18-23814 (RDD)
                                    Debtors.         :
                                                     :
---------------------------------------------------------------x

## GODDARD SYSTEM, INC.'S OBJECTION TO DEBTOR'S MOTION FOR AN ORDER AUTHORIZING DEBTOR TO OBTAIN CREDIT FROM BFT II, LLC PURSUANT TO SECTION 364(C)(1) OF THE BANKRUPTCY CODE

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Goddard Systems, Inc. ("GSI"), an administrative creditor and party in interest in the Chapter 11 bankruptcy case of Creative Learning Systems, LLC (the "Debtor"), the above-captioned debtor, by and through its undersigned counsel, files this objection (the "Objection") to the Debtor's Motion for an Order Authorizing Debtor to Obtain Credit from BFT II, LLC Pursuant to Section 364(c)(1) of the Bankruptcy Code (the "Motion"). In support of the Objection, GSI respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Motion, combined with other documents that the Debtor has filed this evening, demonstrate that the Debtor no longer is operating its business as a debtor-in-possession and no longer is meeting its obligations as a fiduciary for creditors. Instead, the Debtor appears to have turned over its management to a third party called BFT II, LLC ("Manager" or "Lender"), a New

York limited liability company – without notice or authorization from the Court –in violation of its contractual obligations to GSI, and in violation of the Bankruptcy Code and applicable non-bankruptcy law.

2. The Debtor has turned over the management of the Debtor to the very same entity that is identified as an entity that wishes to acquire the assets of the Debtor. Even though the Debtor retained a broker to market its assets, it has abandoned any pretense of running an appropriate sales process. Instead, the Debtor represents that it has turned over all operating authority to Manager, with Manager given the sole discretion to enter into a sale transaction on behalf of the Debtor, even though it intends to sell the business to Manager. At the same time, this Debtor seeks to incur debt from Manager, who has also requested a superpriority administrative expense, and a right to credit bid its debt.

3. The problems with this arrangement are numerous and obvious. This case appears to have run its course. The Debtor has abandoned its duties to creditors and has abandoned its rights and duties as a debtor-in-possession. The Motion should be denied and the inquiry directed to whether a chapter 11 trustee should be appointed, or the case converted or dismissed.

## BACKGROUND

### A. The Goddard Franchise Agreement

4. GSI, as franchisor, and Annette Cunha and Antonio Cunha (the "Franchisees" and together with GSI and the Debtor, the "Parties"), as franchisees, are parties to that certain franchise agreement, dated July 14, 2015 (the "Franchise Agreement"), under which the Franchisees were granted the right and undertook the obligation to operate The Goddard School franchise located at 62 Triangle Center, Yorktown Heights, New York 10598 (the "School").

5. On or around July 14, 2015, entered into an agreement (the "Assignment") pursuant to which the Franchisees assigned all of their rights and obligations under the Franchise Agreement to the Debtor, pursuant to an Assignment and Assumption Agreement (the "Assignment"), but agreed to guarantee all of the Debtor's obligations under the Franchise Agreement and the Debtor agreed to assume all of the Franchisee's obligations under the Franchise Agreement.

6. By Stipulation of Settlement, dated July 23, 2018, Antonio Cunha waived all right, claim, title and interest in the Debtor and Annette Cunha agreed to have Antonio Cunha removed from the Franchise Agreement and the Assignment.

7. On or around August 13, 2018, the Parties entered into an addendum to the Franchise Agreement and Assignment whereby the Parties removed Antonio Cunha from those agreements.

8. Under the Franchise Agreement, the Debtor as franchisee, is licensed to use of GSI's confidential and proprietary franchise "System", which includes access to GSI's Confidential Operating Manuel, other proprietary information, proprietary marks, trade dress, design, décor, image, lay-out, know-how, trade secrets, procedures, standards, specifications, equipment, market analysis, procurement of students, sales, merchandising methods, quality assurance standards, training of franchisees, advertising techniques, record keeping and business management,

9. Pursuant to the Franchise Agreement, the Debtor is obligated to pay GSI on a monthly basis royalty fees based on a certain percentage of all cash collected, or other consideration received (the "Royalties'), as well as to pay monthly advertising contributions (the

"Advertising Contributions") in the amount of $3,000 or 4% of Gross Receipts, whichever is greater.

10. The Franchise Agreement also makes clear the Duties of the Franchisees. Most notably among those duties for the purpose of this Objection, is the specific designation of a franchisee, who has been approved, and trained by GSI, to conduct the day-to-day management and operation of the School. That on-site operator is required to have undergone a background investigation conducted by GSI, been approved by the state childcare licensing agency and to have been trained by GSI before he/she assumes the operation of the business. The Franchise Agreement specifically states that the Franchisee may not change the designated on-site operator during the term of the Agreement without GSI's prior written approval.

11. The Franchise Agreement is clear regarding the confidential nature of GSI's Operating Manuel as well as its proprietary marks.

### B. The Debtor's Failure to Satisfy its Chapter 11 Obligations

12. On November 26, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

13. Since the Petition Date, the Debtor has failed to satisfy the obligations of a Chapter 11 Debtor.

14. Until late last night, the Debtor's only action since the Petition Date is to retain legal counsel and to retain a broker to market and sell the Debtor's business *nunc pro tunc* to the Petition Date. To date, the broker has not formally presented any prospective purchasers. At Debtor's request, GSI marketed the Debtor's franchise for sale for months before the Debtor filed bankruptcy.

15. The Debtor, under the ownership and management of Ms. Cunha, seemed to be operating the School in the ordinary course as a debtor-in-possession. At a minimum, the Debtor continued to perform some, but not all, of its obligations under the Franchise Agreement in the ordinary course post-petition, the same way it had pre-petition. The Debtor even made the required monthly payments under the Franchise Agreement for the first two months of the case. The Debtor, however, failed to make those payments for February and March 2019.

16. What has been less clear is the Debtor's cash flow and ability to sustain its operations. The Debtor was unable to sustain its monthly rent payments at the pre-petition rates, so the Debtor and the landlord entered into a stipulation (the "Rent Stipulation"), dated January 15, 2019, which reduced the monthly rent from $27,318.18 to $10,000 from December 2018 through May 14, 2019 and deferred the payment of the remaining amounts until June 15, 2019. *See* ECF No. 20. In exchange for landlord forbearing its rights to seek relief from the automatic stay in order to pursue its state law remedies, the Debtor was afforded some breathing room to find a buyer or a viable exit strategy. Despite this grace period of reduced monthly administrative expenses, the expiration of this rent forbearance period is nearing and the Debtor is still without a prospective purchaser. During that same time, the Debtor still accrued administrative expenses, which remain unpaid today.

17. The Rent Stipulation may have helped the Debtor to sustain its operations in a cost effective manner, but the creditors would not know because, until this evening, the Debtor has consistently failed to file the monthly operating reports ("MORs") required of a Chapter 11 Debtor. Before today, the Debtor has filed MORs only for the few days in November that fall within the post-petition period and December. The Debtor did not file those reports until March 21, 2019. *See* ECF Nos. 24 to 28. This evening, the Debtor filed MORs for January, February, and March

2019.  Consequently, GSI suspects the Debtor also failed to pay its required fees to the United States Trustee.

18. Annette Cunha resorted to funding the Debtor's monthly payroll by credit card without Bankruptcy Court approval.  On March 25, 2019, Ms. Cunha, the Franchisee and operator of the School, filed a proof of claim (*See* Claim #8) for $19,563.78 in cash advanced to fund the Debtor's payroll account on November 19, 2018 (approximately 1 week before the Petition Date), which was paid for on a Wells Fargo Business Card Visa in the name of the Debtor and Ms. Cunha.

19. As of the date of this Motion, the Debtor owes GSI approximately $19,544.00 (the "GSI Admin Expenses") in post-petition administrative expenses.  The GSI Admin Expenses are allocated as follows:

> **February 2019**
> - Royalties - $6,839.00
> - Advertising[1] - $2,880.00
>   > **February Total:** $9,719.00

> **March 2019**
> - Royalties - $6,945.00
> - Advertising - $2,880.00
>   > **March Total:** $9,825.00

20. Based on the claims register for the Debtor's case, the Debtor also appears to have secured creditors, including Funding Circle Marketplace, which asserts to have made a secured business loan to the Debtor and is now owed nearly $70,000.  Based on the MORs filed to date, the Debtor has not made any payments to this, or any other secured creditor.

21. Since the Petition Date, in addition to the GSI Admin Expenses, the Debtor has caused a number of non-monetary defaults under the Franchise Agreement, which include but are not limited to the following:

---

[1] GSI is currently giving the Debtor the benefit of calculating the advertising fees at the 2018 rate of advertising.

- Entertaining a sale process and prospective purchasers without GSI's involvement and/or pre-approval;

- Permitting prospective purchasers of the Debtor's business access to meetings and school events that would expose non-Debtor third parties to GSI's proprietary information that are protected by the confidentiality provisions of the Franchise Agreement.

- Entering into a management agreement with a party unknown to GSI and permitting such manager access to GSI's confidential proprietary information.

- Installing a manager that has not undergone the required application process administered by GSI, which includes a significant background check. Manager has also not been trained in GSI's System, as required of franchisees and managers under the Franchise Agreement.

- Failure to notify GSI of material changes to the information provided to GSI in the franchise application.

**C. The Debtor's Motion for Post-Petition Financing**

22. Late in the evening on Thursday, April 17, 2019, the Debtor, by and through new proposed counsel, Bronson Law Offices, P.C. ("Bronson") filed the Motion. The Motion is perhaps the most the Debtor has told the Court or its creditors about its post-petition operations.

23. For the first time, GSI is learning about the Debtor's status and plans for the school in which it has a proprietary interest, and is forced to evaluate it on merely a moment's notice, which run afoul of the Bankruptcy and Local Rules for motions of this kind. Notably, the Motion seeks entry of a final order without the requisite notice required by the Bankruptcy Code. The Debtor's Motion acknowledges the rule and then ignores it without providing cause.

24. In sum, the Motion seeks the Court's approval of a $20,000[2] post-petition loan from the Manager, which recently took over management of the Debtor. The Debtor represents, without

---

[2] This amount does not cover GSI's accrued Admin Expenses, let alone the budget going forward.

proof of an agreement, that the Manager took over management of the Debtor on April 5, 2019, by agreement between the manager and Annette Cunha ("Ms. Cunha"), the sole member of the Debtor. *See* Motion at ¶ 7. The Debtor claims the Debtor's management was replaced by the Manager over the concern that the company will not successfully emerge from Chapter 11 bankruptcy without pro-active management and a cash infusion. *See* Motion at ¶ 14. The Debtor did not seek court approval of the purported management agreement prior to its execution, nor did it seek GSI's pre-approval, as required by the Franchise Agreement.

25. The Manager of the Debtor is Vladimir Breyter, whom the Debtor represents is interested in purchasing the Debtor's assets. According to the Motion, Mr. Breyter's family member owns the Manager.

26. Notwithstanding the apparent familial relationships of these parties and the lack of disclosures about their identities, relationships or independence from the Debtor or Ms. Cunha, the Debtor, by and through the Manager, seeks court approval to provide debtor in possession financing upon the terms set forth in the Motion and the annexed, *unsigned* loan agreement (the "Loan Agreement") between the Debtor as the Borrower, to be signed by the Manager, and the Lender, who are one and the same.

27. The Debtor seeks to borrow the funds ($20,000) from the Lender (the "Loan") pursuant to the Loan Agreement allegedly to help the Debtor to "pay its ongoing, necessary and ordinary course post-petition expenses (particularly payroll for which there will be a shortfall next week if dip financing is not permitted) and sustain operations until the Debtor can stabilize itself." *See* Motion at ¶ 12.

28. The Debtor claims it will be operating at a break even soon, but that the Debtor urgently needs the Loan to sustain its operations. As such, the Lender, was willing to lend the

Debtor funds, but only on terms that are favorable to the Lender. The Lender is seeking the following terms:

- ➢ An administrative claim in favor of the Lender with super-priority over other administrative expense claims;

- ➢ Loan will be payable on the earlier of: (a) one (1) year from the date of the remittance of the Loan; (b) dismissal of the Debtor's Chapter 11 case; (c) conversion of the Debtor's Chapter 11 case to a proceeding under Chapter 7 of the Bankruptcy Code; (d) BFT II, LLC ceasing to be manager of the Debtor; or (e) failure to make an agreement with the Debtor's landlord regarding the lease for Debtor's business premises;

- ➢ Loan Agreement envisioning the execution of a promissory note that is as yet unsigned;

- ➢ The Loan will accrue interest at the rate of seven percent (7%) on the average daily outstanding balance and principal and interest shall be upon one of the triggering events in subparagraph two above.

- ➢ The Loan may be converted to equity of the Debtor at any time, in part or in whole, at the option of the Lender on the basis of a pre-money valuation of $5,000.

- ➢ The Loan may be credit bid in a sale of the Debtor's assets.

- ➢ The Loan Agreement is expressly conditioned upon the entry of a final order of by the Bankruptcy Court authorizing the Loan Agreement and the approval of administrative priority status granted to the Lender.

29. The Debtor filed a budget (the "<u>Budget</u>") in connection with the Motion, but failed to clarify the source of the numbers it uses and failed to incorporate the accrued GSI Admin Expenses into the budget for payment from the Loan proceeds or otherwise.

30. The Budget expressly states that it will not provide for the Debtor to pay overdue Royalties to GSI or other claims. Instead, even with the proposed Loan, the Debtor will continue

9

to run an administratively insolvent case. The Debtor provides no insight into how the Debtor would right its ship and meet its administrative expense obligations.

31. This evening, the Debtor's ostensible proposed replacement counsel filed a letter to this Court announcing its new role and including as Schedule 1 thereto a description of a new management agreement (the "Management Agreement") for the Debtor. The Debtor did not file the Management Agreement. Although GSI requested that the Debtor furnish it with a copy of the Management Agreement, the Debtor has not done so. At Schedule 1, the Debtor describes the authority it has delegated to Manager. That authority includes the exclusive authority the business and affairs of the Debtor. The Debtor also has authorized Manager to make all decisions regarding the sale and disposition of the Debtor's assets – even though counsel's letter indicates that Manager intends to acquire the Debtor's assets.

32. The Debtor's actions are inconsistent with its obligations as a debtor-in-possession, its contractual obligations to GSI, and its obligations under New York State law. GSI respectfully requests that the Court deny the Motion. In the alternative, GSI requests that any order granting the Motion be interim only, and that the obligations the Debtor is incurring be granted administrative expense status only – without superpriority status.

## OBJECTION

33. GSI opposes the relief sought in the Debtor's Motion and requests that the Court deny the Motion for at least the following reasons.

**A. Issues with the Debtor's Case Overall**

34. It has been nearly five months since the Debtor filed bankruptcy and there has been little or no action by the Debtor to exit bankruptcy or to present a viable plan. During that time, the Debtor has been substantially derelict in its duties as a Chapter 11 Debtor. Notwithstanding

the benefit of the rent reduction the Debtor experienced over the last few months, the Debtor is still delinquent in paying its administrative expenses as evidenced by the GSI Admin Expense. The Debtor has been delinquent in filing its MORs, does not appear to be paying its obligations to the U.S. Trustee, and is not meeting its other ongoing obligations to GSI.

35. The Debtor generally appears to be in disarray. Based on this Motion, the Debtor appears to be replacing its counsel without seeking authority from the Court or making its requisite disclosures in support of counsel's retention, including attesting to Bronson's own disinterestedness.

36. The Debtor now states in this Motion that it entered into a management agreement to replace the current management, Ms. Cunha. Not only did the Debtor execute this purported agreement without Bankruptcy Court authority, it did so without GSI's approval as required by the Franchise Agreement. The Debtor has now exposed GSI's proprietary information and materials to an undisclosed third party without affording GSI the opportunity to perform due diligence on the management. Not only does this put GSI's property at risk, it permits an unknown party to operate a school with young children without following the protocols GSI has in place for its franchisees. It also fails to satisfy the regulations of the New York State Childcare Licensing Agency.

37. The Debtor has not disclosed the management agreement to GSI or the Bankruptcy Court. This evening, Bronson filed a letter on behalf of the Debtor making certain fact-based representations about the management agreement without actually disclosing it. Not only should the Court have approved this agreement in advance of its execution, but GSI does not know any reason why the Debtor cannot disclose such agreement now. Moreover, such facts should be accompanied by an affidavit from Ms. Cunha or the Manager, but rather are presented by Bronson.

### B. GSI's Concerns Regarding the Debtor's DIP Motion

38. There are a number of procedural defects and substantive issues with the Motion. The Motion presents a past and proposed course of action for the Debtor that violates the Franchise Agreement, the Bankruptcy Code and Rules and New York State Law, specifically as it relates to the operations of a childcare center.

39. First, the Motion seeks entry of a final order but does so without sufficient notice under the Bankruptcy Code and Bankruptcy Rules. The Debtor failed to file a motion to shorten notice that would show "cause" as to why the Debtor requires relief so urgently, so GSI cannot fairly assess whether this relief is required and whether this funding is so urgently needed. GSI opposes entirely the relief sought in the Motion. However, if the Court is inclined to grant the requested relief, then it should do so on an interim basis after GSI and other parties can ascertain the facts necessary to resolve its objections.

40. Second, the Debtor presented no evidence in support of the Motion. There is no evidence of the Debtor's authority to enter into the Loan Agreement or to bind the Debtor to its terms. The relationship between the new Manager and the Lender is not arms' length. Thus, it raises a number of issues, including but not limited to who authorized the Loan, whether the Debtor sought financing from other sources, whether other loans were available to the Debtor, whether the Loan was negotiated was in good faith and in the best interest of the Debtor's creditors, and whether the Debtor's new counsel was involved and who it represented in the transaction.

41. The Loan appears to be between the Debtor and the Manager/Lender. Ms. Cunha was removed from the transaction and the Debtor's operations. The Manager has announced its intention to bid for the Debtor's assets; therefore, the Debtor has ceased serving as a fiduciary for its creditors. A potential bidder for the Debtor's assets is now running the Debtor and, by this

Loan Agreement, is controlling the Debtor's finances at the expense of the Debtor's other creditors, like GSI whose Admin Expenses neither the Debtor nor the Lender proposes to pay under this arrangement.

42. Further, without the MORs on file and other necessary evidence disclosed in connection with the Motion, the Debtor has not satisfied GSI that a DIP Loan is even required. In fact, any disclosures that the Debtor has made to GSI in connection with its reporting requirements under the Franchise Agreement show that the Debtor is operating in the black. Those reports show that not only can the Debtor make payroll but it also has sufficient cash flow to pay GSI's franchise royalty fees, which it has not done for at least two months. Since the Debtor only filed MORs this evening, GSI has been unable to compare the financial information disclosed on its reports with that set forth in its MORs. Based on the information available to GSI, it appears that the Loan is not as urgent as the Debtor would lead the Court to believe. At a minimum, there is a conflict between the Debtor's representations in the Motion and those it made directly to GSI.

43. The Loan Agreement makes the representation that the Borrower is unable to obtain funds on terms any less stringent than those proposed by the Lender; however, the Motion fails to address the process undertaken by the Debtor to draw that conclusion.

44. Additionally, the proposed Loan fails to address the Debtor's administrative insolvency, which began months ago. The Debtor has failed to remain current on payment of its administrative expenses, including the GSI Admin Expenses, which now total nearly $20,000 post-petition and continue to accrue.

45. The Debtor has not presented evidence showing that approval of this DIP Loan for $20,000 would solve the Debtor's administrative insolvency. Moreover, the Debtor proposed the Loan only on terms that would cause further harm to other creditors, like GSI. The proposed terms

of the Loan give the Lender superpriority status over other administrative creditors without providing the evidence necessary to determine whether the Loan will actually make the Debtor administratively solvent and able to confirm a plan.

### C. **The Debtor's Actions Violate the Franchise Agreement, the Bankruptcy Code, and State Law**

46. The Debtor's post-petition actions raise a number of concerns. First, under the Franchise Agreement, only Ms. Cunha can manage the franchise. Now, based on an undisclosed management agreement, GSI learned for the first time in this Motion that the Debtor's management actually changed from Ms. Cunha to the Manager. As set forth at length above, the Debtor's change in management to the Manager violates the Franchise Agreement in a number of ways. It positions a person unknown to GSI to manage a franchise without pre-approval or the opportunity to conduct due diligence on the Manager, run background checks or otherwise determine whether the Manager is qualified to run the franchise. The Manager has not undergone the requisite training GSI requires of its Managers and this unauthorized management transition has exposed and placed at risk GSI's confidential proprietary information.

47. That Manager is now also the proposed Lender who is seeking to own the Debtor and aims to gain superpriority over all other creditors in the process, even those who have accrued unpaid administrative expenses during the first five months of this case. The Manager/Lender's proposed role in this case presents a conflict of interest that puts the interests of other creditors in the Debtor at risk.

48. The new Manager has not been through GSI's required due diligence process and through this management change, the Debtor has now exposed GSI's proprietary resources to a person about whom the Court, the creditors and certainly GSI, do not know anything.

49. The unauthorized management change also causes concern about potential violations of New York State law. The Debtor has not shown in its Motion or otherwise any evidence that the new Manager is either authorized or qualified to operate the facility, let alone a childcare center, which has its own specific and stringent regulations for its operators. The Debtor has not shown compliance with State Law in this regard and GSI cannot abide a facility operating illegally with the Goddard name attached to it.

50. Moreover, the Debtor's actions as set forth in the Motion also suggest violations of the Bankruptcy Code. Specifically, the Debtor has not disclosed the Manager to GSI, the United States Trustee or the Court, nor did it retain the Manager under Sections 330 or 363 of the Bankruptcy Code. Rather, it appears the Debtor improperly delegated its authority to operate the Debtor's business to the Manager under Sections 1107 and 1108 rendering the actual Debtor no longer a debtor in possession.

## RESERVATION OF RIGHTS

51. GSI reserves its rights to amend, further respond or object to this Motion or any such additional filings should any new information become known to GSI.

## CONCLUSION

52. Based on the foregoing, the Court must deny the Debtor's Motion. It is clear based on the lack of facts and evidence presented in the Motion that the Debtor cannot sustain its business nor can it successfully confirm a plan of reorganization. Consequently, not only should the Court deny the Debtor's Motion, but, based on the facts before the Court, should dismiss or convert the Debtor's case.

Dated: New York, New York       FOX ROTHSCHILD LLP
April 18, 2019                  *Attorneys for Goddard Systems, Inc.*

By: */s/ Kathleen M. Aiello*
    Kathleen M. Aiello
    101 Park Avenue, 17th Floor
    New York, New York 10178
    (212) 878-7900